**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

_____

UNITED STATES OF AMERICA,

                Plaintiff,

MICHELLE HARTNESS,

                Intervenor,

  v.                                                   Civil Action No. 3:23-CV-60

STATE OF WISCONSIN,
DEPARTMENT OF MILITARY AFFAIRS,

                Defendant.

_____

**COMPLAINT IN INTERVENTION**
_____

Plaintiff Michelle Hartness alleges:

      1.     This action is brought on behalf of the United States and Michelle Hartness to enforce the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

      2.     All conditions precedent to the filing of this Title VII suit have been performed or have occurred.

**JURISDICTION AND VENUE**

      3.     This Court has jurisdiction over this action under 42 U.S.C. § 2000e-5(f), 28 U.S.C. §§ 1331, 1343(a), and 1345.

4. Venue is proper in the United States District Court for the Western District of Wisconsin pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to this cause of action took place in this judicial district.

## PARTIES

5. Plaintiff United States of America is expressly authorized to bring this action under Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).

6. Plaintiff Michelle Hartness is expressly authorized to intervene in this action by 42 USC §2000-5(f)(1).

7. Defendant, State of Wisconsin, operates and controls the Department of Military Affairs ("WDMA"), a state agency that provides military and emergency management capability for the citizens of Wisconsin and the nation. The WDMA is located in Madison, Wisconsin, within the jurisdiction of this Court.

8. The State of Wisconsin is a person within the meaning of 42 U.S.C. § 2000e(a) and an employer within the meaning of 42 U.S.C. § 2000e(b).

9. Ms. Hartness was employed by the WDMA between 2012 and 2017.

10. Ms. Hartness filed a timely charge of discrimination against the WDMA with the Equal Employment Opportunity Commission ("EEOC") on or about September 27, 2017 (Charge No. 443-2018-00015), alleging that she was discriminated against based on sex because the WDMA hired a less qualified male applicant for a position at a higher salary than the WDMA offered Ms. Hartness for the position.

11. Pursuant to Section 706 of Title VII, 42 U.S.C. § 2000e-5, the EEOC investigated the charge of discrimination filed by Ms. Hartness and found reasonable

cause to believe that she was discriminated against because of her sex. The EEOC referred the matter to the United States Department of Justice after an unsuccessful attempt to voluntarily resolve the charge via conciliation.

## STATEMENT OF FACTS

12. Ms. Hartness, a woman, began working for the WDMA as the Northeast Region Director of the Wisconsin Division of Emergency Management ("WEM") in 2012. In 2015, the WDMA promoted her to Response Section Supervisor at WEM, where she oversaw six Region Directors and six Office Operations Associates.

13. Ms. Hartness's work performance at the WDMA was outstanding.

14. From 2012 to 2016, the WDMA formally evaluated Ms. Hartness's performance at least seven times. She earned the highest overall rating of a five (out of five) for six evaluations and a four (out of five) for one evaluation.

### The WDMA Seeks To Hire A WEM Director Of The Bureau Of Response And Recovery

15. Because the man who had served as the WEM Director of the Bureau of Response and Recovery ("Director" or "Director of the Bureau of Response and Recovery") retired, the WDMA posted a job announcement for the position in December 2016. The published job announcement listed an annual salary range of $79,040 to $91,250.

16. The selection panel for the Director position consisted of four individuals, including the Hiring Supervisor.

17. The Hiring Supervisor was the supervisor for the Director and supervised Ms. Hart-ness at the time she applied for the position.

18. The Director position would have been a one-step promotion for Ms. Hartness.

19. Approximately 20 individuals, including Ms. Hartness, applied for the position.

20. The selection panel interviewed some of the candidates, then ranked its top three choices. The four panelists all ranked Ms. Hartness among their top two candidates. The Hiring Supervisor and another panelist ranked her first, and the two other panelists ranked her second.

21. Adjutant General Donald Dunbar, who led the WDMA, was the hiring official for the Director hiring process.

22. The selection panel recommended that Gen. Dunbar hire Ms. Hartness for the position. Gen. Dunbar agreed to offer the position to Ms. Hartness.

### The WDMA Offers Ms. Hartness Significantly Less Salary Than It Paid A Male Director

23. The Hiring Supervisor recommended that the WDMA offer Ms. Hartness the same salary as the man who served as the Director of the Bureau of Planning and Preparedness, the other bureau director position in WEM.

24. When the WDMA hired this man as the Director of the Bureau of Planning and Preparedness in 2012, it paid him a salary on par with the man who then-held the Director of the Bureau of Response and Recovery position.

25. At that time, the Hiring Supervisor advocated that both bureau directors be paid similar salaries because the male candidate for the Director of the Bureau of Planning and Preparedness was highly qualified, albeit with less experience than the

then-Director of the Bureau of Response and Recovery. He also wanted there to be pay parity between the two WEM bureau director positions.

26. The Hiring Supervisor was knowledgeable about the skills and experience of both male WEM bureau directors because he was their direct supervisor.

27. From 2012 to 2016, the WDMA paid the two male WEM bureau directors similar salaries.

28. When Ms. Hartness applied for the Director of the Bureau of Response and Recovery position in late 2016, the WDMA paid the man who held the Director of the Bureau of Planning and Preparedness an annual salary of about $87,214. At his retirement in 2016, the WDMA paid the man who held the Director of the Bureau of Response and Recovery position, which Ms. Hartness applied for, about $85,904 annually.

29. The Hiring Supervisor advocated to Gen. Dunbar, the decision-maker, that Ms. Hartness be offered the same salary as the male Director of the Bureau of Planning and Preparedness because she was highly qualified for the Director of the Bureau of Response and Recovery position.

30. The Hiring Supervisor pointed out that Ms. Hartness should be offered the same salary as the male Director of the Bureau of Planning and Preparedness because Ms. Hartness was as qualified for the Director position as the male was for his WEM bureau director position when he applied in 2012.

31. Gen. Dunbar, however, authorized a salary offer for Ms. Hartness of only $78,000, which was about 11% less than the salary recommended by the Hiring

Supervisor and the salary of the male Director of the Bureau of Planning and Preparedness.

32. The WDMA's $78,000 salary offer to Ms. Hartness was less than even the lowest salary listed in the job announcement.

33. Ms. Hartness counter offered, requesting a salary of $87,214 and asserting her qualifications for the position warranted that she receive the same salary as the male in the parallel bureau director position.

34. Gen. Dunbar rejected Ms. Hartness's counter offer.

35. Gen. Dunbar authorized an increase in the salary offer to only $79,040, the lowest end of the salary range listed in the job announcement.

36. Thus, the WDMA's final salary offer to Ms. Hartness was about $8,174, or 10% less than it paid the man occupying the other WEM bureau director position.

37. Ms. Hartness turned down the position at this low salary offer.

<u>The WDMA Re-Posts The Director Job Announcement</u>

38. In April 2017, the WDMA re-announced the Director position with an identical job posting, except the salary range was expanded to $60,382 to $101,829.

39. The job posting stated that applicants who had applied under the prior announcement need not reapply and would be reconsidered for the position.

40. Ms. Hartness communicated to the Hiring Supervisor that she was still interested in the Director position.

41. Several candidates who had not applied in the first round applied in the second round, including the man the WDMA eventually offered the Director position and who accepted it ("Male Selectee").

42. The selection panel for this second hiring cycle included the Hiring Supervisor and two of the three prior panelists.

### The Hiring Official Refuses To Consider Ms. Hartness And Offers Male Candidates Higher Salaries Than He Offered Ms. Hartness

43. Gen. Dunbar told a member of the selection panel he would not consider Ms. Hartness in the second round selection process because he had no interest in offering her the Director position.

44. Thus, the selection panel dropped Ms. Hartness from consideration.

45. The selection panel chose three top candidates, all of whom were men.

46. The selection panel ranked a male candidate who had not applied in the first round as its first choice.

47. Its second choice was another male candidate who it had ranked behind Ms. Hartness in the first round of hiring.

48. The selection panel's third choice was the Male Selectee.

49. If Gen. Dunbar had not excluded Ms. Hartness, the Hiring Supervisor would have ranked Ms. Hartness first of all the candidates in this second round.

50. Gen. Dunbar authorized offering approximately $87,000 to the top male candidate.

51. This was approximately the same salary as the male Director of the Bureau of Planning and Preparedness and the retiring male WEM Director.

52. The male candidate rejected the offer.

53. Gen. Dunbar also authorized offering the second-ranked male candidate an $87,000 annual salary.

7

54. The selection committee had ranked this man behind Ms. Hartness in the first round. He rejected the offer.

### The WDMA Offers The Less Qualified Male Selectee A Significantly Higher Salary Than It Offered Ms. Hartness

55. Gen. Dunbar then authorized an annual salary offer of approximately $85,000, with a raise to approximately $86,000 after a one-year probationary period, to the Male Selectee.

56. Thus, the WDMA offered approximately $6,000, then $7,000 after one year, more salary to the Male Selectee than it offered to Ms. Hartness.

57. The Male Selectee was less qualified than Ms. Hartness.

58. When the Male Selectee applied for the Director position, he was the WEM Emergency Government Specialist for the Senior/REACT Center. He had a lower-level position with a lower salary than the Response Section Supervisor position Ms. Hartness held.

59. The Male Selectee had less relevant experience and proven skills for the position than Ms. Hartness.

60. The Director position was in the field of emergency management.

61. The male selectee's experience, however, was almost exclusively in emergency services, specifically fire.

62. In contrast, Ms. Hartness's experience was in emergency management, including in WEM.

63. Ms. Hartness had four years of emergency management experience at WEM. She served as the Northeast Region Director, then was promoted to Response

Section Supervisor, where she oversaw six Region Directors and six Office Operations Associates.

64. During her five years with the WDMA, Ms. Hartness received outstanding performance evaluations, which were conducted by the Hiring Supervisor and his predecessor. Moreover, she had several years of relevant experience before coming to WEM.

65. In addition, the Male Selectee lacked experience managing grants.

66. Managing grants was a part of the Director position.

67. Ms. Hartness had extensive experience managing grants as the WEM Response Section Supervisor.

68. Additionally, Ms. Hartness was already successfully doing significant parts of the Director position when she applied for the promotion.

69. The Male Selectee did not have this or similar experience.

70. The Hiring Supervisor, who was the Male Selectee and Ms. Hartness's direct supervisor, found Ms. Hartness to be more qualified for the position than the Male Selectee. He found Ms. Hartness's experience and skills, including leadership, to be significantly better suited to the Director position than the Male Selectee's. He knew Ms. Hartness would hit the ground running in the Director position, whereas the Male Selectee had a large learning curve.

71. Nonetheless, the WDMA offered the Male Selectee the Director position at a salary of about $85,000, with a raise to $86,000 after a one-year probation.

72. For the Male Selectee, the offer was about a $10,000 raise, or 30% increase, in his salary.

73. The WDMA's salary offer to the less qualified Male Selectee was on par with the salary the DMA paid the male Director of the Bureau of Planning and Preparedness, and on par with the salary the Hiring Supervisor recommended for Ms. Hartness and that Ms. Hartness requested in the first hiring round.

74. In contrast, the WDMA initially offered Ms. Hartness a $78,000 salary, an approximately 13% increase over her then-salary, and then raised the proposed salary only to the lowest amount advertised ($79,040), about a 15% increase in her salary.

75. The Male Selectee accepted the offer and the WDMA promoted him to Director.

76. Ms. Hartness resigned from her employment with the WDMA in approximately September 2017.

77. Ms. Hartness suffered emotional distress and economic harm from the acts of discrimination.

78. Ms. Hartness suffered lost wages, benefits, and other economic losses from the pay discrimination.

## COUNT I

Title VII, 42 USC § 2000e-2(a)
*Compensation Discrimination Based on Sex*

79. The United States and Ms. Hartness re-allege and incorporate herein the allegations set forth in paragraphs 12-78 above.

80. Ms. Hartness was discriminated against because of her sex, in violation of Title VII, 42 USC § 2000e-2(a), when the WDMA offered her a lower salary for the Director of Response and Recovery position than it offered or paid similarly or less qualified men.

81. Ms. Hartness was highly qualified for the Director position based on her skills,

82. Ms. Hartness was as or more qualified than the Male Selectee.

83. In addition, she was as or more qualified than the man who held the parallel Director of the Bureau of Planning and Preparedness position when he was hired in 2012.

84. Despite a recommendation from the Hiring Supervisor to offer Ms. Hartness an annual salary of about $87,214, commensurate with her qualifications and equal to the salary of the male Director of the Bureau of Planning and Preparedness, the WDMA initially offered Ms. Hartness only $78,000 annually for the Director position. This salary offer was about 11% less than the male WEM bureau director's salary.

85. Ms. Hartness counter offered, requesting an annual salary of about $87,214 based on her qualifications and the salary of the male who held the comparable Director of the Bureau of Planning and Preparedness.

86. But Gen. Dunbar, the ultimate decision-maker, rejected Ms. Hartness's counter offer. He refused to offer her more than $79,040. This was 10% less salary than that recommended by the Hiring Supervisor and the salary of the male Director of the Bureau of Planning and Preparedness. It was the lowest salary advertised for the position.

87. Ms. Hartness rejected the low salary offer.

88. The WDMA then conducted a second hiring process, re-posting the job announcement. Gen. Dunbar refused to consider Ms. Hartness in the second round even though the job posting said the WDMA would consider all who applied in the first round.

89. Excluding Ms. Hartness, the selection committee ranked three men as its top candidates.

90. The Hiring Supervisor would have ranked Ms. Hartness first above the other candidates, but had to exclude her from consideration based on Gen. Dunbar's refusal to offer Ms. Hartness the position.

91. The WDMA offered every male candidate more salary than it offered Ms. Hartness. It offered the first- and second-ranked men an annual salary of $87,000.

92. The WDMA's $87,000 salary offers to these male candidates were nearly the same salary the WDMA paid the male in the parallel Director of Bureau of Planning and Preparedness position.

93. After the two male candidates turned down the position, the WDMA offered the Male Selectee $85,000, with an increase to $86,000 after one year. He accepted the offer and was promoted to Director.

94. Ms. Hartness was similarly situated to the Male Selectee and the male Director of the Bureau of Planning and Preparedness position when he was hired in 2012.

95. The WDMA treated Ms. Hartness less favorably by offering the Male Selectee approximately $6,000 more annual salary initially, and then $7,000 more annual salary after one year, than it offered Ms. Hartness. The WDMA also treated Ms. Hartness less favorably by offering her approximately $8,000 less than it paid the male in the Director of the Bureau of Planning and Preparedness position.

## **PRAYER FOR RELIEF**

96. WHEREFORE, the United States and Ms. Hartness pray that this Court grant the following relief:

(a) Enjoin the State of Wisconsin from engaging in compensation discrimination, in violation of Title VII, against any WDMA employee or applicant for employment at the WDMA;

(b) Award backpay and all other appropriate monetary and equitable relief, including the value of lost employment wages and benefits, to Ms. Hartness, in an amount to be determined at trial to make her whole for the loss she suffered as a result of the discriminatory conduct alleged in this Complaint;

(c) Award Ms. Hartness any prejudgment interest on the amount of lost wages and benefits determined to be due;

(d) Award compensatory damages to Ms. Hartness to fully compensate her for the pain and suffering caused by the discriminatory conduct alleged in this Complaint, pursuant to and within the statutory limitations of Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a;

(e) Order the State of Wisconsin to institute policies, practices, and programs at the WDMA to ensure a non-discriminatory workplace, including but not limited to implementing appropriate policies and providing adequate training to all WDMA employees and officials regarding compensation discrimination; and

(f) Award such additional relief as justice may require, together with the United States' costs and disbursements in this action.

## JURY DEMAND

97. The United States and Ms. Hartness hereby demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

Dated this 16th day of March, 2023.

    /s/Jill M. Hartley
Jill M. Hartley (SBN 1027926)
Emma M. Woods (SBN 1120187)
The Previant Law Firm S.C.
310 W. Wisconsin Ave., Suite 100
Milwaukee, WI 53203
414-271-4500 (Telephone)
414-271-6308 (Fax)
jh@previant.com

Attorneys for Intervenor Michelle Hartness