IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                Plaintiff        OPINION AND ORDER

and

                                                                    23-cv-60-wmc

MICHELLE HARTNESS,

                Plaintiff-Intervenor,

    v.

STATE OF WISCONSIN, DEPARTMENT
OF MILITARY AFFAIRS,

                Defendant.

Plaintiff contends that defendant Wisconsin Department of Military Affairs ("WDMA") violated Title VII, 42 U.S.C. § 2000e-2(a), by offering plaintiff-intervenor Michelle Hartness a lower salary than the man that it later hired, even though she was more qualified. WDMA has moved for summary judgment, contending that it offered that man more money because he had better management and leadership experience. Because plaintiff has presented evidence from which a reasonable jury could conclude that WDMA's decision to offer Hartness a lower salary was motivated by her sex, the court must deny defendant's motion.[1]

---

[1] In addition, the government has moved for leave to file a sur-reply brief, which the court will grant and has considered. WDMA argues in its reply in support of its proposed findings of fact that the government's claim for injunctive relief lacks any merit (dkt. #61, at 212), but it did not develop that argument, so the court will not address it.

UNDISPUTED FACTS[2]

A. Background

WDMA is a state agency that provides military and emergency management capabilities for Wisconsin and the United States. Hartness began working for WDMA's Division of Wisconsin Emergency Management ("WEM") in 2012 as the Northeast Region Director. In 2015, she was promoted to Response Section Supervisor, where she oversaw six region directors and six office operations associates. At all relevant times, Adjutant General Donald Dunbar directed and supervised WDMA with Michael Hinman serving as his executive assistant and Brian Satula as the WEM administrator. The directors of the Bureau of Planning and Preparedness and Bureau of Response and Recovery reported to Administrator Satula. Finally, at all relevant times, Joane Mathews was WDMA's Director of Human Resources.

B. Hartness is Selected for the Director Position

WDMA first posted the position of Director of the Bureau of Response and Recovery in December 2016, listing a salary range of $79,040 to $99,840. Qualified applicants would have training, education, and/or experience in four areas: (1) program and policy development; (2) incident command/emergency management; (3) program/project management; and (4) leadership/supervision.

---

[2] Unless otherwise noted, the following facts are deemed undisputed for purposes of summary judgment based on the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support.

Among other applicants, Hartness applied for the position, emphasizing her work for WEM since 2012 and that in her current position as the Response Section Supervisor, she was responsible for, among other things, managing the delivery of emergency management programs statewide. (Ex. 300 (dkt. #57-61) 1.) Before working at WEM, Hartness also had three years' experience as the Clark County Emergency Management Director, where she had managed limited-term employees and led the county through disasters, including a federal disaster declaration. (*Id.* at 2.) Finally, her resume listed eight years of experience at the United Way, where she worked as the manager of the "2-1-1" call center supervising volunteers, then as the "2-1-1" director/community services liaison responsible for budgeting, hiring, firing and developing staff. (*Id.* at 2.) In her cover letter, Hartness also emphasized her leadership and supervision experience, noting that she managed personnel in six locations across the state as the WEM Response Section Supervisor. (Ex. 302 (dkt. #57-62) 2.)

Two subject matter experts initially screened the applicants' resumes, scoring Hartness at 7 and 8 (out of a possible 9 points). Greg Engle, the then current Director of the Bureau of Planning and Preparedness and one of the resume screeners, explained those scores meant that Hartness was "sort of exceptionally qualified." (Engle Dep. (dkt. #38) 20.) Following the resume screening, WDMA assembled a selection panel to interview candidates. WEM Administrator Satula chaired the panel as the hiring supervisor. The other panelists were Executive Assistant Hinman, HR Director Mathews, and Minnesota Emergency Management Director Joe Kelly. After interviewing 12 candidates, Satula and Kelly ranked Hartness first, while Hinman and Mathews ranked Edward Wall, the previous

3

WEM Administrator first, and Hartness second. In particular, Mathews scored Hartness's interview performance as a 36 out of a possible 40 points; Hinman scored Hartness's interview performance a 10, although Hinman did not specify a range for his personal scoring system, and Satula and Kelly did not use a numerical ranking system. (Ex. 134 (dkt. #57-51) and Ex. 3 (dkt. #57-3).) In his interview notes, Satula also wrote that Hartness had 20 years' experience at the "local to state" level and was supervising six regional offices. (Ex. 134 (dkt. #57-51) 9.) Satula further prepared a summary of the top two candidates' qualifications, noting that Hartness had: "extensive program-specific experience"; "numerous relationships with all stakeholders"; good interpersonal skills; and shown the ability to manage. (Ex. 135 (dkt. #57-52) 1-2.) Even so, Satula also noted Hartness's "somewhat limited" leadership and management experience. (*Id.* at 2)

Because WDMA Adjutant General Dunbar had final approval over any hire for the bureau director position, his Executive Assistant Hinman and WEM Administrator Satula prepared a memorandum listing the panelists' collective thoughts about each of the top candidates. As to Hartness's strengths, they noted that she: (1) had broad knowledge and experience; (2) led by example; (3) cared deeply about service; (4) was an energetic self-starter; (5) was an experienced project manager that delivered results; and (6) had been handling the bureau director duties since December 2016. (Ex. 52 (dkt. #57-23.) On the other hand, they expressed concern about how she handled failure and noted that she needed to finish human resources tasks in a timely manner. (*Id.*) Ultimately, the panelists deferred to Satula's top choice, and unanimously recommended Hartness for the position, a recommendation that General Dunbar approved.

4

### C. Hartness Turns Down the Position

According to WDMA's hiring checklist, once approved, an "HR specialist contacts supervisor to discuss conditions of employment (e.g., start dates. *rate of pay*, FLSA designation, etc.)." (Ex. 29 (dkt. #41-8) 3 (emphasis added).) Accordingly, once General Dunbar approved hiring Hartness, WDMA's HR Director Mathews emailed Allisa Brown, a human resources specialist, asking her to continue following the checklist and work with WEM Administrator Satula on the details of Hartness's hire. In determining a salary specifically, Mathews testified that WDMA first considers the salaries of other state employees in similar positions, because "you want to have some type of equity." (Mathews Dep. (dkt. #31) 18.) WDMA also considered the person's resume and experience, as well as the agency's budget. (*Id.*)

Under the Wisconsin Compensation Plan, the position of Director of the Bureau of Response and Recovery position was "broadbanded," which allowed state agencies to exercise discretion in setting the salary within a range. In this case, the bureau director position had an annual salary range of $60,382.40 to $101,129.60. For current state employees promoted to a new position, the Compensation Plan requires that they receive a raise that is *at least* eight percent of the applicable pay range minimum. Otherwise, the Plan itself offers no further guidance in determining employee compensation. (Brown Dep. (dkt. #36) 18.)

By e-mail, WDMA's HR Director Mathews further stated that she did "not recommend paying [Hartness] what [the Bureau Director Engle] is currently being paid," which was about $87,214.40. (Ex. 55 (dkt. #41-17) 3.) Instead, Mathews suggested that

5

"[b]ecause [Hartness] is moving up two levels, you can give her a 12% raise, which is $3.49, for a total of $36.63 [or $76,190.40 annual salary]," adding that the maximum hourly rate was $48.62. (*Id.*) Mathews further testified that "two levels" referred to Hartness's salary range but she acknowledged that there was no rule that Hartness could only be given a maximum of a 12 percent raise. (Mathews Personal Capacity Dep. (dkt. #33) 34.)

In response, WEM Administrator Satula "strongly disagree[d]" with Mathews' approach because: (1) the maximum hourly pay range for other state administrative managers was $60.71 per hour; (2) the other administrative managers did not have 24-hour, on-call responsibilities like WEM managers did; (3) Hartness supervised more people than Engle; (4) Engle was underpaid; (5) the two director positions were very similar; and (6) Hartness had management experience. (*Id.* at 2.) Under these circumstances, Satula stated, "[t]he right thing to do is to pay personnel commensurate to their responsibilities," concluding that, if Mathews was "fixed" in her position, then he would make the case for a higher salary to General Dunbar. (*Id.*) Mathews replied that: she had merely quoted the maximum salary according to the job posting; she was only expressing her opinion; and aside from General Dunbar's approval, there was nothing preventing Satula from offering Hartness a higher salary. (*Id.* at 1-2.)

After meeting with at least some of the panelists,[3] General Dunbar authorized the panel to offer Hartness a $78,000 salary, which was below the position listing minimum.

---

[3] There is conflicting evidence about whether the panelists presented a single salary recommendation to General Dunbar. HR Director Mathews testified that the panel recommended a single salary of about $78,000 (Mathews Dep. (dkt. #31) 32), while Dunbar's Executive Assistant Hinman testified that each panelist recommended a different salary. (Hinman Dep. (dkt. #32) 28.)

6

General Dunbar testified that he would "generally" explain why he chose a particular course of action, but simply did not recall exactly what he said as to Hartness's salary. (Dunbar Dep. (dkt. #34) 29.) Dunbar added that he relied on HR Director Mathews and her department in deciding Hartness's salary because they were the experts, stating that the salary offer was "100 percent based on the professionals saying this is what we believe this individual should get for a salary, and that's going to be based on qualifications and experience." (*Id.* at 24, 29.)

WEM Administrator Satula conveyed this $78,000 offer to Hartness, who counteroffered at $87,214.40 plus other benefits (like an additional week of vacation), noting that the $78,000 offered was below the posted minimum salary range for the position.[4] (Ex. 56 (dkt. #41-18) 4-5.) In a follow-up e-mail to Mathews and Hinman, Satula stated that he was unsure if he could offer any additional information to impact General Dunbar's decision, but he reiterated his reasoning for offering Hartness a similar salary to Engle. (Ex. 56 (dkt. #41-18) 3.) Satula further added that Hartness was "managing the most difficult parts of the [bureau director] job right now along with her current supervisor job." (*Id.*) In the end, General Dunbar authorized an amended offer of $79,040, the advertised minimum for the position (Ex. 57 (dkt. #41-19)), which Hartness also rejected. When Hartness counteroffered for a second time, again asking for an $87,214.40 salary (dkt. #41-38) 1), WDMA apparently rejected it. Ultimately, Hartness

---

[4] WDMA argues that no reasonable juror could conclude it offered different, more favorable, non-salary terms of employment to other bureau directors, and neither plaintiff nor plaintiff-intervenor offers any evidence of discrimination in the terms of employment.

7

resigned from her existing position as Response Section Supervisor in July 2017. (Ex. 304 (dkt. #41-39.))

### D. WDMA Reposts the Position and Hires Paul Cooke

In April 2017, WDMA reposted the bureau director position in a near-identical job posting with an expanded salary range of $60,382 to $101,829, stating that applicants who had applied in response to the first job announcement would be considered without reapplying. After the job was reposted, Hartness told Satula that she was still interested in the position, and he continued to consider her to be a candidate. Paul Cooke applied after the position was reposted. Among other experiences, Cooke's resume indicated that he began working for WEM in 2016 as an Emergency Government Specialist, where he was responsible for supervising 44 limited-term employees. (Ex. 99 (dkt. #41-31) 5.)[5] Cooke's resume further listed four years' experience as the Director of the Colorado Division of Fire Prevention and Control, where he administered a 30-million-dollar budget, managed 6 direct reports with responsibility for 120 permanent full-time employees, plus 30 seasonal firefighters, and oversaw the state's wildland fire and prescribed burn programs. (*Id.* at 5.) Before that, Cooke's resume reflects that he had worked as the Deputy Director (2 years) and Director (13 years) of the Colorado Department of Public Safety's Division

---

[5] Plaintiff objects that Cooke's resume is inadmissible hearsay. However, insofar as the resume was considered by WDMA in determining Cooke's hiring and salary, the resume is not offered to prove the truth of the matter asserted and is not hearsay. Fed. R. Evid. P. 801(c)(2); *see also Luckie v. Ameritech Corp.*, 389 F.3d 708, 716 (7th Cir. 2004) (statements were not hearsay because they showed decision-maker's state of mind at the time she was evaluating plaintiff's performance). In any event, Cooke has provided a declaration averring to many of the same experiences on his resume. (Cooke Decl. (dkt. #62).)

of Fire Safety, noting his serving in command positions or as part of general staff for several state disasters. (*Id.*)

The second posting used the same process and screening criteria as the first. Satula, Mathews and Hinman remained on the selection panel, although Minnesota Director Kelly dropped out. At the screening stage, Cooke received scores of 6 and 7 out of 9 points, and Mathews scored Cooke's interview performance at 26 out of 40 points. In a May 8 e-mail, Hinman wrote that General Dunbar told him "not to include [Hartness as a finalist] as he has no interest in offering her the job (again)." (Ex. 77 (dkt. #57-38) 1.) About one week later, Hinman e-mailed Satula and Mathews, stating that he was not confident that the top two, male candidates would accept an $80,000 salary, and Satula responded that he had no idea why the salary was set so low, noting that they had lost a qualified candidate and could lose other qualified candidates. (Ex. 63 (dkt. #57-31) 1.) Hinman responded that he thought General Dunbar would agree to a salary closer to $87,000 based on the top candidates' extensive experience. (*Id.*) Later that month, in an e-mail discussing other candidates, Satula wrote that he continued to believe that Hartness was the best candidate, and she only turned down the job offer because of the "extremely low wage offered." (Ex. 67 (dkt. #57-34) 2.)

On July 7, Hinman e-mailed General Dunbar stating that the selection panel recommended offering a salary between $85,000 and $86,000 with an attached memorandum listing the top three, male candidates. (Ex. 38 (dkt. #57-17.) The panelists listed Cooke as their third-choice candidate, noting that his strengths included: "[v]ery good state level experience with inter-departmental cooperation"; great experience taking

9

a collaborative approach to resolve tough subjects; great management, personnel and evaluation skills; and a good leader. (Ex. 37 (dkt. #57-16) 2.) As to weaknesses, the panelists noted that the majority of Cooke's experience was in fire service, and his communication skills were lacking. (*Id.*) That same day, Dunbar authorized the selection panel to offer their first-choice candidate the job with an $85,000 salary, but he turned down the position. Next, without General Dunbar's approval (Dunbar Dep. (dkt. #34) 51), the panel offered the job to the second-choice candidate, Wall, also at $85,000, but he, too, turned down the position. After the second-ranked candidate rejected the job offer, Satula e-mailed Hinman, asking if Dunbar should be briefed before Satula made an offer to Cooke. Hinman responded minutes later, directing Satula to offer the job to Cooke at an $85,000 salary. Cooke asked for a higher salary, but Satula told him that $85,000 was the highest he could offer (Cooke. Dep. (dkt. #35) 23), and Cooke accepted the offer.

OPINION

The government contends that WDMA offered Hartness a lower salary because of her sex in violation of Title VII of the Civil Rights Act of 1964, which makes it unlawful for an employer to "discriminate against any individual with respect to his compensation" because of "such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Because WDMA has moved for summary judgment, the "singular question" for the district court is whether the plaintiff has introduced evidence permitting "a reasonable factfinder to conclude" that the plaintiff's sex "caused the . . . adverse employment action." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). Under Title VII, "[a]n unlawful employment practice is established when a

plaintiff demonstrates that a protected characteristic, such as sex, was a *motivating factor* for an employment decision." *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007) (emphasis added).

While a plaintiff is free to offer direct or circumstantial evidence of discrimination, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Still, the "familiar" burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), allows "a plaintiff to make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601 (7th Cir. 2020).

Summary judgment is only appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court considers "all of the evidence in the record in the light most favorable to the non-moving party" and draws "all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020) (quotation marks omitted).

Here, WDMA undoubtedly lowballed Hartness with its $78,000 and $79,040 salary offers, but it is a close question whether a reasonable jury could conclude that Hartness's gender was a motivating factor in WDMA's decision to offer her a lower salary than it offered any of the three male finalists after a second round of hiring such that it violated Title VII. To be sure, the court is not a "super-personnel board" that reviews

11

WDMA's salary offers for their business acumen. *Palmer v. Indiana Univ.*, 31 F.4th 583, 592 (7th Cir. 2022) (quotation marks omitted). However, plaintiff has identified sufficient evidence to permit a reasonable jury to conclude that WDMA discriminated against Hartness, including: (1) inconsistencies in WDMA's rationale for offering her a lower salary than Cooke; and (2) its different considerations and process for determining Hartness's salary versus determining the second-round, male candidates' salary.[6]

## I. Inconsistencies in WDMA's Non-Discriminatory Reasons for Offering Hartness a Lower Salary

Inconsistencies in the evidence supporting WDMA's proffered, nondiscriminatory reasons for offering Hartness a lower salary than Cooke -- her relative lack of leadership, management, and strategic experience -- would permit a reasonable jury to infer these reasons were pretext for sex discrimination. Specifically, during the selection phase, the panelists' sole documented concern about Hartness's leadership, management or strategic experience was Satula's note that she had "somewhat limited" management and leadership experience. (Ex. 135 (dkt. #57-52) 2.) Notably, Mathews, who later justified offering Hartness a lower salary because of her limited leadership and management experience, did not express this concern during the selection phase, only worrying about her ability to complete human resources paperwork timely. (Hinman Dep. (dkt. #32) 22; (Ex. 52 (dkt. #57-23).) WDMA fairly points out that the selection and salary setting processes were different, and Mathews was not required to document every concern she had at the

---

[6] Plaintiff-intervenor Hartness adopted the government brief in opposition to summary judgment. (Dkt. #56.)

selection phase, but that is an argument WDMA can present to the jury, not grounds for summary judgment.

WDMA also provided inconsistent justifications for offering Hartness a lower salary during the salary-setting-phase and after she complained to the EEOC.[7] A jury may reasonably infer pretext from "flagrant" inconsistencies in an employer's proffered nondiscriminatory reasons for an employment action. *Baker v. Macon Res., Inc.*, 750 F.3d 674, 677 (7th Cir. 2014). Initially, Mathews implied that WDMA could only offer Hartness a 12 percent raise, writing, "[b]ecause [Hartness] is moving up two levels, you can give her a 12% raise." (Ex. 55 (dkt. #41-17) 3.) However, Mathews acknowledged a short time later, and during her deposition in this case, that no rule prevented WDMA from offering Hartness more than a 12 percent raise. (Mathews Personal Capacity Dep. (dkt. #33) 34.)

After Hartness filed a charge with the EEOC, Mathews next swore in her first EEOC affidavit that WDMA offered Cooke more money because he had more "executive level supervisory experience" than Hartness, noting that Cooke was tasked with mentoring a low-performing supervisor after he was hired. (Mathews Aff. Jan. 24, 2018 (dkt. #57-64) ¶¶ 11-12.) In another affidavit submitted to the EEOC two months later, Mathews also discussed problems with Hartness's tenure at WDMA, explaining that she was an "inexperienced and immature" supervisor who often did not think about how her actions or management style affected her subordinates. (Mathews Aff. Mar. 30, 2018 (dkt. #57-

---

[7] Hartness filed a charge with the EEOC in 2017 (Ex. 63 (dkt. #57-63)), but the result of any EEOC proceeding is not in the record, nor would it be admissible at trial.

65) ¶¶ 11-12.)  Mathews further averred she had personally received complaints about how Hartness mistreated subordinates and was rude to HR staff, noting that Hartness had also not completed employee evaluations.  (*Id.* ¶¶ 13-14.)  Similarly, Mathews expanded on Hartness's lack of supervisory experience, noting that she had only two years' supervisory experience and some of those reports were part time.  (*Id.* ¶ 15.)  In her final affidavit before the EEOC, Mathews explained that the "directorate was crumbling based on lack of solid leadership," and it needed an effective and experienced leader like Cooke.  (Mathews Aff. July 12, 2018 (dkt. #57-66) ¶ 11.)

In Mathews' deposition, she testified that her recommendation that WDMA offer Hartness a lower salary than Cooke was based on her limited supervisory, leadership, and strategic experience, noting that she had worked at the county and regional level but had no national or state level experience.  (Mathews Dep. (dkt. #31) 44.)  At that point, Mathews did not dispute that Hartness had nine and a half years of supervisory experience, but she still viewed Hartness's leadership experience as limited, given that she supervised part-time employees or volunteers and she had limited experience with recruiting, hiring, discipline, and evaluations.  (*Id.*)  General Dunbar testified that he relied on Mathews' recommendation in determining Hartness's salary offer, explaining that her recommendation would have been based on qualifications and experience.  Likewise, at summary judgment, WDMA relies on Mathews' determination that Hartness's relative lack of management and leadership experience in comparison to Cooke as a legitimate reason for offering her a lower salary.  (Def.'s Br. (dkt. #46) 26-28.)

14

While Mathews consistently mentioned Hartness's inability to timely complete human resources paperwork before and after WDMA offered Cooke a higher salary, there are other inconsistencies from which a reasonable jury could infer pretext, including her initial, procedural justification for offering Hartness a lower salary and then pivoting to Hartness's lack of experience and poor leadership style.  Moreover, a reasonable jury could infer that Mathews' concerns about Hartness's experience were an after-the-fact attempt to justify offering her a lower salary, as those concerns presumably would have been highly relevant to the decision to *hire* her, but there is no evidence that Mathews raised them at the hiring stage.  *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 882 (7th Cir. 2016) ("When evidence indicates an attempt to justify a discharge after the fact, it can suggest a discriminatory motive." (quotation marks omitted)).

Next, there is at least some evidence inconsistent with WDMA's assertion that it offered Cooke more money than Hartness because of his experience.[8]  At base, there is conflicting evidence about how important leadership and management skills were to the position with Satula testifying that the position was technical, not executive, while Mathews testified that the position required a strong leader.  (*Compare* Satula Dep. (dkt. #50) 29-30 *with* (Mathews Dep. (dkt. #31) 46).)  Further, while not directly on point as

---

[8] Citing to *Millbrook v. IBP, Inc.*, 280 F.3d 1169 (7th Cir. 2002), WDMA also argues that there is no basis to conclude Hartness's credentials were so superior to Cooke's that no reasonable employer could have chosen to offer her a lower salary.  *Id.* at 1180 (where employer's offered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, "evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." (quotation marks omitted)).  However, *Millbrook* is distinguishable because Cooke was not the best-qualified candidate.  He was actually the third-best candidate in the second round.

15

to Hartness's management, leadership and strategic experience, there is evidence that she was generally more qualified than Cooke as: she scored slightly higher than he did at the resume screening stage; Mathews scored Hartness's interview performance higher than Cooke's; and Satula documented Hartness's 20 years of "local to state" experience, asserting that she was "by far" the most qualified candidate and noting that most of Cooke's experience was in the fire service. (Ex. 134 (dkt. #57-51) 9 and Satula Dep. (dkt. #50) 48.)

That is not to say there is no evidence that Cooke had more management, leadership, and strategic experience than Hartness. Satula had also noted Hartness's "somewhat limited" management and leadership experience, and the panelists as a group noted that Wall had "[p]roven leadership skills" and got the "big picture," which arguably supports an inference that Hartness, who did not receive similar comments, did not have comparable leadership skills. (Exs. 52, 135 (dkt. #57-52, 57-53).) Cooke had four years' experience directly managing six employees with responsibility for another 150 employees when he oversaw Colorado's fire and burn program. Before that, he had 13 years' experience as the Director of Colorado's Division of Fire Safety where he had served in command for several state disasters. In comparison, Hartness had about two years' experience managing region directors as the WEM Response Section Supervisor, and eight years' experience at the United Way where she managed volunteers and staff. Given that Hartness was arguably at least as qualified as Cooke for the position, a reasonable jury could infer that WDMA's inconsistent, shifting, and arguably after-the-fact reasons were pretextual.

16

Finally, even if this were not enough, there are other facts a reasonable jury could consider in deciding pretext. First, the panelists did not just offer a higher salary to Cooke, but to all three of the male finalists in the second group. Moreover, despite WDMA announcing that Hartness and other, first-round applicants would again be considered; it listing Wall, a first-round candidate, as a second-round finalist; *and* Satula still finding her more qualified than any of the second-round finalists, General Dunbar ordered the panelists not to include her as a second-round finalist. Second, having decided to offer more money to the top, male, second-round finalists, there is a question as to why a similar, higher offer was not made to Hartness.

## II. WDMA's Arguably Different Process to Determine Salary Offers to Male Candidates

After reposting the position, WDMA considered what salary the top, male candidates would likely accept even *before* they had narrowed down the finalists and decided on a salary offer. In contrast, there is no evidence that WDMA considered what Hartness would accept, as its initial offer of $78,000 was below the advertised *minimum* salary posted for the position, only increasing its offer to the advertised minimum when Hartness counteroffered. Further, under WDMA's hiring checklist, after a candidate is approved, the HR specialist is to contact the supervisor to discuss, among other things, rates of pay, and the panelists followed that process during Hartness's recruitment. However, in the reposting, the panelists combined those steps -- simultaneously recommending three, male finalists and a salary range to General Dunbar above that ever offered to Hartness. *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 931 (7th Cir. 2020) (a jury

could find that "deviation from standard procedures also lends support to [plaintiff's] claims); *but see Bagwe*, 811 F.3d at 882 ("employer's departure from its own policies may be circumstantial evidence of discrimination," but "there must be evidence of a specific policy that is *regularly enforced* and followed in similar situations." (emphasis added)).

There is also a material dispute of fact about whether the board individually considered the male candidates' qualifications and experience in setting their salary offers. For one, WDMA offered one of the three finalists, Wall, a higher salary than it offered Hartness, even though panelists had apparently unanimously recommended hiring Hartness over him during the first recruitment process. Also, WDMA offered an *identical* $85,000 salary to each male candidate, which suggests that they did not consider each man's qualifications. Finally, Satula testified that the panel did not consider each male candidate individually in determining their recommended salary (Satula Dep. (dkt. #50) 56.),[9] while Mathews and Hinman testified that the panel considered the merits of each candidate individually and just happened to recommend the same salary for each based on their respective experiences. (Mathews Personal Capacity Dep. (dkt. #33) 67; Hinman Dep. (dkt. #32) 47.) Thus, a reasonable jury may infer sex discrimination based on WDMA's different considerations and process for male candidates, particularly considering the dispute of fact as to whether WDMA considered each male candidate on his merits.

In sum, while a reasonable jury certainly *could* conclude that WDMA's reasons for offering Hartness a lower salary than Cooke were legitimate and non-pretextual in light of

---

[9] Defendant objects that Satula's statement lacks foundation without explaining why, so the court will not address that argument further.

18

Hartness's, Cooke's and the other male finalists' respective qualifications, plaintiff has offered enough evidence -- WDMA's inconsistent and late-developing concerns about her experience, consideration of what salaries male candidates would accept, and departure from its hiring checklist -- for a reasonable jury to conclude that WDMA discriminated against Hartness.[10]

ORDER

IT IS ORDERED that:

1) Plaintiff's motion for leave to file a sur-reply brief (dkt. #65) is GRANTED; and

2) Defendant's motion for summary judgment (dkt. #40) is DENIED.

Entered this 9th day of May, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[10] Plaintiff also provides data for the past bureau directors' salaries, but the court does not currently find that information particularly useful absent more information about those directors' respective backgrounds.